

DA 07-0022

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 81

MARY JO SCHUFF,

Plaintiff and Appellant,

v.

ROBERT L. JACKSON,

Defendant and Appellee.

APPEAL FROM: District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. CDV 98-815(b),
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

William J. Gregoire and Stephanie A. Hollar, Smith, Walsh,
Clarke & Gregoire, PLLP, Great Falls, Montana

For Appellee:

E. Lee LeVeque, Lee LeVeque Law Offices, Great Falls, Montana

Robert F. James, Ugrin, Alexander, Zadick & Higgins, PC,
Great Falls, Montana

Submitted on Briefs: January 16, 2008

Decided: March 11, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1 Appellant Mary Jo Schuff (Schuff) appeals the jury verdict of the Eighth Judicial District Court, Cascade County, finding in favor of Appellee Robert L. Jackson (Jackson). This is the second time the merits of this case have come before this Court following a jury's defense verdict. We affirm.

¶2 Schuff raises the following issues on appeal:

¶3 1. Did the District Court err by denying Schuff's Rule 56 motion for summary judgment and Rule 50 motion for judgment as a matter of law on the issue of Jackson's negligence?

¶4 2. Did the District Court err by allowing Jackson to introduce evidence regarding the duty of care owed by boat operators?

¶5 3. Did the District Court err by denying Schuff's motion for default judgment, or alternatively for attorney fees and costs, as a sanction for State Farm's late disclosure of Jackson's recorded statement?

¶6 4. Did the District Court err by denying Schuff's request for a curative instruction regarding Jackson's intent?

## FACTUAL AND PROCEDURAL BACKGROUND

¶7 We set forth the pertinent facts of this case in *Schuff v. Jackson*, 2002 MT 215, ¶¶ 6-9, 311 Mont. 312, ¶¶ 6-9, 55 P.3d 387, ¶¶ 6-9 (hereinafter "*Schuff I*"), and given the issues raised herein, recite them again. On July 28, 1996, Donald and Mary Jo Schuff were invited by Jackson and his wife to accompany them on a boat ride on the Missouri River in Jackson's twenty-one foot competition ski boat. Schuffs accepted the Jacksons'

2

invitation and at about 2:00 p.m. that day, they launched the boat from Broadwater Bay, south of Great Falls, Montana. After launch, Jackson operated the boat southward or upstream with the intention of taking Schuffs to a large sand bar located further upstream. To get to the sand bar, Jackson had to navigate past an underwater rock formation which extended from the west bank of the Missouri River, approximately three-fourths of a mile south of White Bear Island Marina. Jackson knew the location of the rock formation and understood that the rock formation was dangerous to boaters. As an experienced boater on the Missouri River, Jackson had navigated his boat through the area on approximately forty prior occasions. *Schuff I*, ¶ 6.

¶8 To safely negotiate the area where the rock formation is located, boat operators must navigate through a narrow channel between a hidden sandbar on one side and the underwater rock outcropping on the other. The channel is approximately twenty to twenty-five feet wide. On the day of the collision, Jackson saw rippling water over the formation as he approached from about 100 yards away and was aware that the rippling water indicated either shallow water or an obstruction. Based on his knowledge of the area and its inherent risk, Jackson ensured that all of his passengers were safely seated. He then successfully navigated two of the three rock outcroppings before colliding with the third. *Schuff I*, ¶ 7.

¶9 Jackson's boat collided with the rock formation at a speed of between twenty-eight and thirty-two miles per hour. Jackson acknowledged that he could have slowed the speed of the boat as he approached the rock formation and admitted he miscalculated its location. However, he also testified that it would have been dangerous for him to

3

navigate the channel at a slower speed because more of the boat would have been in the water, the boat would have been less maneuverable, and that at a slow speed, the river current could more easily move the boat out of position. Therefore, he believed that the proper way to travel through the channel was "on plane," so that as little of the boat as possible was in the water. Jackson navigated the boat on the day of the collision in the same manner he had on previous occasions. *Schuff I*, ¶ 8.

¶10 As a result of the collision, Schuff was thrown from her seat into Donald. She sustained a closed head injury and Donald suffered minor injuries. Schuffs alleged that Jackson's negligence caused their injuries. *Schuff I*, ¶ 9.

¶11 The first jury trial in this matter was held in March 2000 before the Honorable Kenneth R. Neill, district judge, and following a verdict for Jackson, Schuffs appealed. We affirmed the District Court's denial of Schuffs' motions for judgment as a matter of law and motion for a new trial, *Schuff I*, ¶¶ 24, 32, but reversed and remanded for a new trial based on the District Court's failure to instruct the jury "regarding the higher degree of care imposed on Jackson based on his knowledge of the rock formation and the statutory duty imposed on Jackson by § 23-2-523(4), MCA." *Schuff I*, ¶ 39.

¶12 On remand, Schuff once again moved for summary judgment on the issue of liability, and once again, the District Court, Honorable Julie Macek, district judge, presiding, denied the motion. The case was tried to a jury in September 2006. One week prior to trial, Jackson's insurance carrier, State Farm, produced a recorded statement Jackson had provided to State Farm two years after the boating accident occurred but prior to the first trial. The statement fell within the requests for production made by

Schuff prior to the first trial but was not then provided. Defense counsel was apparently unaware of the recorded statement until State Farm provided it in 2006. The District Court denied Schuff's motion for discovery sanctions in the form of default judgment or, alternatively, attorney fees, for the failure to produce the document previously. Schuff's counsel used the statement during cross-examination of Jackson, and it was admitted as evidence.

¶13 At the conclusion of the second jury trial, another verdict in favor of Jackson was returned. Schuff then filed a motion for judgment notwithstanding the verdict, a motion for a new trial, a motion for a new trial on damages, and a motion to reconsider the court's previous ruling on her motion for default judgment or, alternatively, attorney fees. Those motions were deemed denied when the District Court failed to rule within sixty days. *See e.g.* M. R. Civ. P. 59(g) and 60(c).

## STANDARDS OF REVIEW

¶14 We review a District Court's grant or denial of a motion for summary judgment de novo, using the same criteria applied by the district court under M. R. Civ. P. 56. *Silvestrone v. Park County*, 2007 MT 261, ¶ 7, 339 Mont. 299, ¶ 7, 170 P.3d 950, ¶ 7. We also review a District Court's grant or denial of a motion for judgment as a matter of law de novo. *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 18, 336 Mont. 105, ¶ 18, 152 P.3d 727, ¶ 18.

¶15 A district court has broad discretion to determine the admissibility of evidence. *Seeley v. Kreitzberg Rentals, LLC*, 2007 MT 97, ¶ 14, 337 Mont. 91, ¶ 14, 157 P.3d 676, ¶ 14, *overruled on other grounds*, *Giambra v. Kelsey*, 2007 MT 158, ¶ 27, 338 Mont. 19,

5

¶ 27, 162 P.3d 134, ¶ 27. We therefore review a district court's ruling on the admissibility of evidence for an abuse of discretion. *Seeley*, ¶ 14. Likewise, we review a district court's decision regarding the imposition of sanctions under M. R. Civ. P. 37 for an abuse of discretion. *Linn v. Whitaker*, 2007 MT 46, ¶ 13, 336 Mont. 131, ¶ 13, 152 P.3d 1282, ¶ 13. We also review a district court's decision to give or refuse a proposed jury instruction for an abuse of discretion. *Giambra*, ¶ 28. In reviewing for an abuse of discretion, "[w]e consider whether the trial court in the exercise of its discretion acted arbitrarily without the employment of conscientious judgment or exceeded the bounds of reason, in view of all the circumstances, ignoring recognized principles resulting in substantial injustice." *Linn*, ¶ 13 (citations and quotation marks omitted).

## DISCUSSION

¶16 **Did the District Court err by denying Schuff's Rule 56 motion for summary judgment and Rule 50 motion for judgment as a matter of law on the issue of Jackson's negligence?**

¶17 To prove negligence, a plaintiff must establish: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached the duty; (3) the breach was the actual and proximate cause of the plaintiff's injury; and (4) resulting damages. *Bonilla v. U. of Montana*, 2005 MT 183, ¶ 14, 328 Mont. 41, ¶ 14, 116 P.3d 823, ¶ 14. There is no dispute that Jackson owed a duty of care to Schuff and that his "knowledge of the rock formation's existence and its potential danger increased the duty of care imposed on him." *Schuff I*, ¶ 37. According to Schuff, Jackson breached that duty of care by: (1) failing to steer his boat to the left of the rock formation; (2) driving his boat at excessive speeds and failing to slow down as he approached the rock formation; and (3) failing to

6

see or locate the rock formation. Jackson responds that our decision in *Schuff I* continues to support the District Court's denial of both Schuff's motion for summary judgment and motion for judgment as a matter of law. In *Schuff I* we held:

> [W]hether Jackson breached his duty as an ordinarily prudent boat operator depended on whether he used reasonable care and whether he operated his boat in a manner which would endanger the life, limb, or property of others by engaging in unreasonable or unnecessary maneuvers.
>
> The fact that Jackson admitted error during the operation of his boat does not establish negligence per se. The relevant inquiry is whether there was sufficient evidence for the jury to find that Jackson did not breach his legal duty as a boat operator. We conclude that the jury's verdict which found that Jackson was not negligent was supported by substantial evidence.
>
> First, based on Jackson's testimony, it was clear that Jackson had intimate knowledge of the river where the collision occurred, was aware of the presence of the underwater hazard, and had taken the precautions he thought necessary as he approached the area. He was an experienced boater on the Missouri River, and had safely negotiated his way through the hazard on approximately forty prior occasions. As Jackson approached the hazard on the day of the collision, he proceeded in the same manner he had on previous successful trips through the channel. There was no evidence that his behavior was out of the ordinary, or that he engaged in any unreasonable or unnecessary maneuvers.

*Schuff I*, ¶¶ 18-20.

¶18 The evidence introduced in the second trial was substantially similar to the evidence in the first. In *Schuff I*, Jackson's testimony was bolstered by three expert witnesses who had extensive boating experience on the Missouri River, and specifically in the area where the collision occurred. *Schuff I*, ¶ 21. Each of Jackson's three witnesses at the first trial "testified of his belief that the safest way to travel through the channel was 'on plane,' so that as little of the boat as possible was in the water." *Schuff I*,

¶ 21. Those three witnesses testified to the same effect at the second trial. In addition, a fourth witness, Erik Kalafat, testified at the second trial that he traveled through the channel "on plane" everyday and had seen law enforcement officers travel through the channel "on plane" fifty or sixty times. The jury was also shown a video of numerous boaters traveling through the channel "on plane."

¶19    Schuff did not call an expert witness at the first trial. At the second trial, Schuff called Mike Carter, who testified that he had traveled through the channel thousands of times, and in fact had lived just 200 yards from the rock outcropping for eight or nine years. However, even Carter testified that the majority of the time he traveled through the channel, he did so "on plane" at speeds between twenty-five and thirty-five miles per hour. According to Carter, the only time he chose to float through the channel slowly was when he and his friends were just "lolling" down the river chatting and drinking beer. Apparently Schuff's purpose in calling Carter was to prove to the jury that Jackson could have safely navigated the channel slowly. Schuff argues that the "experts" testified that a person does not need to navigate the channel on plane "and that it is possible to float through the channel at 4-5 miles per hour." However, merely because there are two ways of doing something does not mean one is necessarily unreasonable. At most, Carter's testimony demonstrated that it was possible to navigate the channel in multiple ways—but that, in his experience, navigating the channel "on plane" was appropriate most of the time.

¶20    The only difference of note in the evidence produced at the second trial was the previously undisclosed statement that Jackson provided to his insurer two years after the

accident, and which was not turned over to Schuff until one week prior to the second trial. The following exchanges appear at various points in the recorded statement:

Q: Okay, were the rocks submerged?
A: Yes they were. They were not visible.
. . .
Q: Okay, okay. Now, when the accident happened, did you have any forewarning that you were gonna hit rocks?
A: Oh heavens no it just happened, instantaneously.
Q: Okay.
A: With no warning whatsoever.
. . .
Q: Okay, yeah, okay. So, and I guess back again, there was no indication that you were "off course." I hate to use that phrase but . . .
A: No.

According to Schuff, this statement is inconsistent with Jackson's earlier trial testimony and demonstrates that he forgot where he was in the river and struck the rock formation without warning. Schuff contends that because Jackson's recorded statement does not indicate that he saw ripples in the water, steered left to avoid the rock formation, or had his boat "on plane," his statement was inconsistent with his trial testimony. According to Schuff, Jackson was either negligent for seeing the rocks and running into them, or negligent for not seeing them, forgetting where they were, and running into them. Either way, Schuff argues that Jackson was negligent as a matter of law.

¶21 However, the recorded statement is not necessarily inconsistent with Jackson's testimony. Simply because Jackson did not mention that he saw ripples or that he put the boat "on plane" does not necessarily discredit his later testimony to that effect. He was not asked any question which would have required him to provide that information. Jackson's recorded statement simply acknowledges that the rocks were submerged and

9

that he was unaware that he was going to hit them. The absence of any reference to ripples in the water or steering to the left does not mean those things did not occur. Jackson's statement simply confirms that he was approaching the channel in what he believed was the same manner he had done approximately forty times before.

¶22 Despite the fact that Schuff had an expert testify on her behalf at the second trial, and offered evidence implying that Jackson had not seen the rocks or steered to avoid them, Schuff was unable to convince a second jury that Jackson's act of traveling through the channel "on plane" was a breach of a duty. Schuff notes that the dissent in *Schuff I* perceived the first jury's verdict as "an anomaly" and that the question of whether Jackson was negligent should never have been given to the jury in the first place. *See Schuff I*, ¶ 45 (Cotter, J., dissenting). This Court held otherwise, however, as did a second judge, and a second jury's disposition of the case was identical to that of the first jury.

¶23 Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." M. R. Civ. P. 56(c). When Schuff moved for summary judgment, material questions of fact remained, including potentially conflicting expert testimony on whether it was safer to travel through the channel slowly or "on plane." Schuff argued in her brief in support of summary judgment that "new" evidence showed that Jackson's decision to navigate the channel "on plane" was a negligent act. The

District Court correctly denied Schuff's motion for summary judgment on liability on this record and allowed the case to proceed to trial.

¶24 Judgment as a matter of law is only appropriate when there is a "complete absence of any evidence which would justify submitting an issue to a jury." *Johnson*, ¶ 18. "Judgment as a matter of law is not proper if reasonable persons could differ regarding conclusions that could be drawn from the evidence." *Johnson*, ¶ 18 (citation omitted). The evidence presented through Jackson's testimony and his four experts indicated that Jackson acted in accordance with what the expert witnesses agreed was a reasonable manner of navigating the channel. Even Schuff's expert testified that he navigated the channel "on plane" most of the time. Thus, the District Court clearly acted correctly in denying Schuff's motion for judgment as a matter of law.

¶25 Finally, as in the first appeal, sufficient evidence supported the jury's verdict that Jackson was acting as an ordinarily prudent boat operator on the date of the collision. *See Schuff I*, ¶ 24. Sufficient evidence also supported the jury's determination that Jackson did not violate § 23-2-523, MCA, by failing to operate his boat in a safe and prudent manner. Schuff was given a full opportunity to make her case, but was not able to muster the necessary evidence to overcome the defense, either in the minds of two juries who considered the evidence or, following application of the appropriate standards of review by this Court, in the eyes of the law.

¶26 **Did the District Court err by allowing Jackson to introduce evidence regarding the duty of care owed by boat operators?**

11

¶27   Schuff argues that the District Court committed reversible error by permitting Jackson's four expert witnesses to testify that the normal way to navigate through the channel is "on plane." According to Schuff, "Jackson created the impression of a false duty of care that substantially misled the jury . . . . Merely because the custom among boaters on the Missouri River is to drive through the channel area at high speed does not mean Jackson acted prudently," and thus, the jury was improperly instructed about the standard of care. Jackson responds that his experts' testimony provided the jury with concrete evidence of how ordinarily prudent boat operators navigate the channel. Jackson points out that Schuff's own expert witness also testified that he normally travels through the channel "on plane."

¶28   In the second trial, the range of evidence that Jackson was able to provide about this unique and dangerous portion of the Missouri River was more limited than in the first trial. The District Court did not allow Jackson to introduce evidence of other accidents that had occurred at the rock outcropping, as Jackson had in the first trial. The District Court did allow Jackson's expert witnesses to testify as to the manner in which a boat must be operated in order to safely navigate the channel. M. R. Evid. 702 provides: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." We agree with Jackson that the information provided by his expert witnesses was not within the knowledge of an average juror, was appropriately given, and did not rise to the level of instructing the jury as to the standard of care. The

testimony provided by Jackson's expert witnesses, as well as by Schuff's own expert witness, simply helped the jury to understand the accepted way that boaters navigate the channel.

¶29    The District Court properly instructed the jury on Jackson's duty of care under Montana law.  The District Court did not abuse its discretion by allowing Jackson's expert witnesses to testify that the safest way to navigate the channel is "on plane."

¶30    **Did the District Court err by denying Schuff's motion for default judgment, or alternatively for attorney fees and costs, as a sanction for State Farm's late disclosure of Jackson's recorded statement?**

¶31    One week before the second trial, Jackson's attorney produced the transcribed copy of the statement Jackson had given to his insurer, State Farm, two years after the accident.  Schuff's counsel had requested the recorded statement more than seven years earlier in discovery requests sent to Jackson prior to the first trial.  At that time, Jackson responded that, to the best of his knowledge, no tape or writing existed.  There is no indication of, and Schuff does not allege, any misrepresentation or misconduct by Jackson or his counsel in the tardy provision of the statement.  However, State Farm apparently had possession of the recorded statement, but did not turn it over until just prior to the second trial.  Jackson's counsel then gave it to Schuff.

¶32    During the second trial, Schuff's counsel utilized the statement on cross-examination and in closing arguments in an attempt to impeach Jackson's testimony that he had seen ripples indicating the outcropping and put the boat "on plane" to avoid it.  However, Schuff argues that, nonetheless, she was deprived of the opportunity to present an effective case because her attorneys were "forced . . . to switch gears completely" just

prior to trial in order to focus on this newly discovered evidence. According to Schuff, she had only two choices at that point: "cancel trial and redo old discovery, or proceed to trial without the benefit of preparation." Schuff proceeded to trial, but moved the District Court for default judgment or, in the alternative, attorney fees, as a sanction for State Farm's alleged discovery abuse.

¶33 The District Court denied Schuff's motion for two reasons. First, the District Court concluded that our holding in *In re the Rules of Professional Conduct*, 2000 MT 110, 299 Mont. 324, 2 P.3d 806, precluded it from imposing sanctions on Jackson for his insurance company's misconduct, as State Farm was not a party and did not control the litigation. Because we held in *In re Rules* that Jackson's counsel represents Jackson only, and not his insurance company, the District Court felt that it could not impose the sanctions requested by Schuff because the violation was the fault of the insurance company, not Jackson or his attorney. Second, the District Court did not impose sanctions because it concluded the recorded statement was not substantially different from Jackson's previous statements, and in any event, inconsistencies could be explored during cross-examination.

¶34 Outside the presence of the jury, the District Court explained its ruling as follows:

> Looking at the statement of Mr. Jackson and comparing the statement that he made in the tape that has now been disclosed and contrasting that with what has been provided to this Court previously in regards to his statement, it appears to me that the statements that he has made that may differ from those that he has previously made can be adequately addressed and disclosed during any cross-examination, and certainly can be considered as an inconsistent statement in any regard that they are contrary.

14

In looking at the statement, which I have in some detail, I do not agree that it is a substantial deviation. I think the things that are not in the statement he could be questioned about, and that can be brought out in front of the jury, and he can offer whatever explanation he wishes to offer for those, but I do not believe that this Court has the authority to provide counsel with the remedy that it seeks against the insurance company under these particular circumstances, when there's no allegation of any wrongdoing on the part of either the defendant or defense counsel, and what we're talking about is a third-party's misconduct or allegation of third-party misconduct here.

In clarifying its decision upon further inquiry from Schuff's attorney, the District Court emphasized that, though it was unsure about the interplay between an insurance company and its insured, it was confident that the alleged misconduct here did not warrant sanctions. The District Court reiterated:

I do have concerns about the whole issue of the insurance company and the party. I also think that in looking at the statement of Mr. Jackson that the remedy here [of] default judgment, I think, is obviously the most extreme of all remedies, and I don't believe that it is an appropriate sanction under the circumstances with—in comparing two statements. I don't—it does not appear to me that this is the type of statement . . . where what's not disclosed is the smoking gun, you know, damaging statement that was intentionally withheld . . . . And I don't think that that's what we have here in comparing this to . . . the statements that the parties believe that Mr. Jackson has previously made and is [sic] the prior testimony in this case . . . .

¶35 We do not agree that the District Court was powerless to impose sanctions against an insurance company for its discovery-related misconduct on the grounds that it is not a party to the litigation, it did not control the litigation, or that Jackson was "the sole client of defense counsel." *In Re Rules*, ¶ 38. *In Re Rules* addressed the application of the Rules of Professional Conduct to the insurance contract, and obligations of defense counsel to the client and the insurance company. *In Re Rules*, ¶¶ 35-38. Neither the

15

Rules of Professional Conduct nor the obligations upon defense counsel arising therefrom have been raised here. Rather, the question is whether the insurer can be sanctioned for its part in an asserted discovery abuse occurring during litigation. Clearly, it can be. Sanctions may be imposed without running afoul of the attorney-client obligations we set forth in *In Re Rules*.

¶36 However, we conclude that the District Court did not abuse its discretion by further determining that the imposition of sanctions was not appropriate under the circumstances here. A default judgment would have been a harsh sanction against Jackson for the misconduct of his insurance company. We have recognized that the "trial judge is in the best position to know which parties callously disregard the rights of their opponents and other litigants seeking their day in court, and that the trial judge is also in the best position to determine which sanction is the most appropriate." *Schuff v. A.T. Klemens & Son*, 2000 MT 357, ¶ 69, 303 Mont. 274, ¶ 69, 16 P.3d 1002, ¶ 69 (citations and internal quotation marks omitted). The District Court concluded that any prejudice to Schuff appeared to be minimal and was accounted for by admitting the recorded statement as evidence and allowing Schuff to use the statement to impeach Jackson's credibility. Schuff did so. The District Court did not abuse its discretion by denying Schuff's motion for default judgment or, alternatively, for attorney fees and costs.

¶37 **Did the District Court err by denying Schuff's request for a curative instruction regarding Jackson's intent?**

¶38 Prior to the second trial, the District Court granted Schuff's motion in limine to exclude evidence of Jackson's intent while operating the boat and evidence of his efforts

not to be reckless. However, during testimony given at the trial about the way in which Jackson was driving, limited comments were made about Jackson's intentions as he was driving the boat. Thus, Schuff requested a curative instruction that, when considering the evidence and determining whether Jackson was negligent, the jury "need not consider Robert Jackson's intent or mental status as this has nothing to do with the question of whether Robert Jackson was negligent."

¶39 Schuff cites two examples of statements made at trial which she believes improperly prejudiced the jury by introducing evidence of Jackson's intent. First, Schuff notes that Jackson testified he "tried" to steer his boat clear of the ripples he saw, and in response to questioning by Schuff's attorney, contended his actions were not "wanton or careless" because he thought he was being totally safe. Schuff's attorney did not object or move to strike this testimony. Second, Schuff raises the fact that counsel for Jackson asked Don Schuff whether he felt like Jackson was doing anything wrong on the day of the accident, or whether Jackson was "being reckless or crazy or anything." Once again, counsel for Schuff did not object, and Don Schuff answered "no." According to Schuff, the aforementioned testimony warranted a curative instruction because "intent is irrelevant in the negligence analysis."

¶40 The examples cited by Schuff were brief comments upon how Jackson was driving the boat at the time of the collision. His testimony that he "tried steering clear of the rippling" cannot be viewed as an improper attempt to interject an "intent" defense into the trial. Indeed, certain aspects of Jackson's intent were raised by Schuff's counsel on

17

cross-examination.[1]  In any event, the testimony cited by Schuff was not objected to. Accordingly, it was not an abuse of discretion for the District Court to conclude that the curative instruction was unnecessary.

¶41    Affirmed.

/S/ JIM RICE


We concur:

/S/ KARLA M. GRAY
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON

---

[1]Schuff's counsel implied that Jackson had carelessly said to himself, "okay, I know where this opening is, I'm not going to back off the throttle at all."